DEPARTMENT OF REVENUE, State of Alaska, Appellant,

v.

Von R. BAXTER, Executor of the Estate of Julius Morris, Appellee.

No. 1351.

Supreme Court of Alaska.

June 25, 1971.

Charles K. Cranston, Asst. Atty. Gen., Anchorage, G. Kent Edwards, Atty. Gen., Juneau, for appellant.

H. Russel Holland, Holland & Thornton, Anchorage, for appellee.

Before BONEY, C. J., and DIMOND, RABINOWITZ, CONNOR and ERWIN, JJ.

## OPINION

RABINOWITZ, Justice.

This appeal raises difficult questions concerning the application of Alaska's inheritance and transfer tax to the interests of a nonresident decedent, as vendor, in several executory contracts of sale relating to real properties located within the State of Alaska.

Appellee, Von R. Baxter, as executor of the estate of Julius C. Morris, instituted suit in the superior court to recover Alaska transfer taxes in the amount of $7,057.70 paid under protest. Morris died a domiciliary of the State of Washington holding the vendor's interests in three executory contracts to convey real estate located in the State of Alaska. These contracts were included in the inventory of the Morris estate which was filed in Washington, and inheritance taxes on them were paid to the State of Washington. Subsequently transfer taxes were paid to the State of Alaska under protest on the real properties which were the subject of the three executory contracts. After considering cross motions for summary judgment, the superior court held that the decedent's interests in the three executory contracts were not subject to Alaska's transfer tax. We affirm.

Under the law as it stood at the time of decedent's death, Alaska imposed a transfer tax, under AS 43.30.010,

upon a transfer of real, personal, or mixed property, or an interest in property * * *.

(2) if a transfer is by will or intestate law, of property in the state, or within its jurisdiction and the decedent was a nonresident of the state at the time of his death * * *.

Our inheritance and transfer tax laws further specify two situations, in regard to the transfer of personal property by a nonresident, in which the transfer tax is not payable. In this regard, AS 43.30.200 provides:

(a) The tax imposed by this chapter in respect to personal property, except tangible personal property having an actual situs in the state, is not payable (1) if the transferor is a resident of a state or territory of the United States which at the time of the transfer does not impose a transfer tax or death tax in respect to personal property of residents of this state, except tangible personal property having an actual situs in that state or territory; or (2) if the laws of the state or territory of residence of the transferor at the time of transfer contained a reciprocal provision under which nonresidents are exempted from transfer taxes or death taxes in respect to personal property, except tangible personal property having an actual situs in it, if the state or territory of residence of the nonresident allows a similar exemption to residents of the state or territory of residence of the transferor.

From the foregoing, it can be seen that the transfer tax imposed by AS 43.30.010(a) in respect to intangible personal property is not payable to Alaska if the nonresident's domiciliary state at the time of death does not impose a death tax in respect to intangible personal property of nonresidents. Further, Alaska's transfer tax in respect to intangible personal property does not apply if the nonresident's

domiciliary state at the time of death has a reciprocal tax law exempting its nonresidents from death or transfer taxes as to intangible personal property where its nonresident's domiciliary state has a similar exemption.[1] The former exemption is relevant to the issues in the case at bar for at the time of Morris' death the State of Washington provided that there should be no tax on death transfers of intangible personal property of nonresidents.[2]

The United States Supreme Court has held that the only jurisdiction which may constitutionally levy an inheritance tax on real property and tangible personal property is the state where the property is located at the time of the decedent's death. Treichler v. Wisconsin, 338 U.S. 251, 70 S.Ct. 1, 94 L.Ed. 37 (1949); City Bank Farmers Trust Co. v. Schnader, 293 U.S. 112, 55 S.Ct. 29, 79 L.Ed. 228 (1934); Frick v. Pennsylvania, 268 U.S. 473, 45 S. Ct. 603, 69 L.Ed. 1058 (1925).[3] Since intangible personal property does not have any definite physical situs, the possibility exists that more than one state will have some connection with the intangible personal property in addition to the domiciliary state of the deceased owner. In a series of opinions, the Supreme Court of the United States has ruled that there is no constitutional impediment to the imposition of multiple inheritance taxes upon intangible personal property. Under these decisions, both the decedent's domiciliary state and any other state which furnishes "benefit and protection" to the property interests

represented by the intangible can impose inheritance taxes. Greenough v. Tax Assessors, 331 U.S. 486, 67 S.Ct. 1400, 91 L. Ed. 1621 (1947); Graves v. Elliot, 307 U. S. 383, 59 S.Ct. 913, 83 L.Ed. 1356 (1939); Curry v. McCanless, 307 U.S. 357, 59 S.Ct. 900, 83 L.Ed. 1339 (1939). Thus, two or more states may constitutionally levy an inheritance tax upon the same intangible personal property of the decedent. The possibility of multiple impositions of inheritance taxes on intangible personal property has been significantly reduced by the states other than the domicile of the decedent voluntarily giving up their power to tax the decedent's intangible personal property. In this regard some 16 states have exempted from inheritance tax, without qualification, all intangibles owned by a nonresident decedent. Additionally, some 19 states have substantially adopted the Uniform Reciprocal Transfer Tax Act advocated by the American Bar Association and the National Conference of Commissioners on Uniform State Laws.[4]

The exemptions providing for intangible personal property in AS 43.30.200 follow the Uniform Reciprocal Transfer Tax Act. Although the State of Washington has not adopted the Uniform Reciprocal Transfer Tax Act, its own nonresident's intangible property exemption satifies the requirements of AS 43.30.200(a) (1) because Washington does not levy a death tax on a nonresident's intangible personal property. Therefore, the main issue in this appeal is whether Morris' interests at the time of his

---

1. Under AS 43.30.210, AS 43.30.200 is to be "interpreted and construed to effectuate its general purpose to make uniform the law of those states and territories which enact it."

2. Washington taxes all property within its jurisdiction passing by will or intestate succession. Rev.Code Wash. 83.04.010(1). Rev.Code Wash. 83.04.040 provides, however, that there should be no death tax or death transfers of intangible personal property of nonresidents. This latter statute reads:
   Nothing in the inheritance tax provisions of this title shall be construed

as imposing a tax upon any transfer, as defined in this title, of intangibles, however used or held, whether in trust or otherwise, by any person, or by reason of the death of any person who at the time of his death was domiciled in a territory or state of the United States other than the state of Washington.

3. Thus, the possibility of double taxation of real property or tangible personal property is foreclosed.

4. H. Marsh, Jr., Multiple Death Taxation in the United States, 8 U.C.L.A.L.Rev. 69, 70–71 (1961).

death in the three executory contracts for the sale of real properties situated in Alaska were realty or intangible personalty. The superior court held that Morris' interests were intangible personalty and were therefore exempt from transfer taxes under the provisions of AS 43.30.200(a) (1). In this appeal, appellant, the Department of Revenue of the State of Alaska, contends that Morris' interests in the three executory contracts were realty requiring payment of death transfer taxes to the State of Alaska.

The stipulated record discloses the following: Julius Morris died a Washington domiciliary. When he died, he held the vendor's interests in three executory contracts to convey real estate located in Alaska. The Hartwig contract was executed on June 15, 1965. Morris agreed to sell a parcel of Alaska land to the Hartwigs for $15,000, $5,000 down and $10,000 to be paid by September 21, 1966, with 6 per cent interest. The Hartwigs were to have possession from June 15, 1965, the date of execution, were to pay taxes on the property from that date, and were to avoid nuisances and liens on the property. Morris reserved a right of entry to post notices of nonresponsibility. Morris was to execute a warranty deed on June 15, 1965, and put it in escrow pending performance by the Hartwigs. If the Hartwigs defaulted, their payments on the contract were to "be forfeited to the Seller as liquidated damages and in the nature of rent," they were to lose their right to purchase the land, and Morris had a right to re-enter. According to the escrow agreement, the required deed was delivered to the escrowee, but the deed itself is not in the record. When Morris died, the Hartwigs still owed him $10,000 on the contract.

The Fairview contract was executed June 27, 1956. In it Morris agreed to sell a parcel of land in Alaska to Fairview Shopping Center for $1,000,000, $10,000 down and $990,000 plus 4 per cent interest in monthly installments equal to the entire monthly income from the site accruing to the vendee. Fairview agreed to subordinate its interest to that of Morris' mortgage, if Morris mortgaged the property during 1956 as security for a note of up to $300,000. Fairview was to have possession while payments on the contract were being made, except that until the unpaid balance fell to $500,000, Fairview could execute no lease without Morris' approval. Fairview was to pay the taxes on the property. Morris was to place in escrow a warranty deed to the property. Morris could enter the property at any time to inspect it or to post notices of nonresponsibility. Fairview had a duty to keep the premises in good repair. If Fairview failed to perform any duty, Morris was to be released from his duty to convey, Fairview's payments were to be "forfeited to seller as liquidated damages in the nature of rent," and Morris could re-enter. When Morris died, $211,274.93 remained owing on this contract.

The Johnson contract was executed in December 1965 between J. C. Morris and Aquilla Matthews as vendors and Frederick and Jeanette Johnson as vendees for the sale of Alaska land. The price was $4,200, $500 down and $3,700 plus 8 per cent interest in monthly installments, all to be paid by November 1, 1968. The vendors were to execute a warranty deed to the vendees and put it in escrow. The vendees were to pay the taxes on the property. If the vendees defaulted, the vendors were to be released from their duty to convey, the vendees' payments were to be forfeited as "liquidated damages and in the nature of rent," and the vendors were to have a right to re-enter (implying that until default the vendees were to be in possession). When Morris died, $1,546.44 was owing on this contract.

Appellant Department of Revenue argues that Morris' interests were interests in real property, and therefore the reciprocal exemption for intangibles is inapplicable. Appellant stresses that Morris retained title to the three real properties, as well as other substantial interests in these proper-

ties, in addition to receiving the balance of the purchase price plus interest on each of the properties. Reliance is placed upon In re De Stuers' Estate, 199 Misc. 777, 99 N.Y.S.2d 739 (1950)[5] and In re Paul's Estate, 303 Pa. 330, 154 A. 503 (1931),[6] which hold that the vendor, under an executory contract to sell land, is deemed to own the real property for estate tax purposes. In regard to the Fairview contract, appellant points to the fact that since Morris had the power to mortgage the real property this is a clear indication of the real property character of his interests.

Appellee takes the position that Morris' interests were intangible personal property exempt from Alaska death tax under AS 43.30.200(a). Appellee characterizes the various rights in the realty retained by Morris as no more than protections of Morris' security. Appellee argues that Morris was left with the bare legal title since under the doctrine of equitable conversion equitable title was shifted to the vendees.[7] In this regard, appellee further argues that title was sufficiently conveyed out of Morris by virtue of the deeds which he executed and put in escrow simultaneously with the execution of the contracts. So long as the vendees fulfilled their obli-

gation, they were entitled to exclusive possession and control of the properties and to the profits from it. Appellee additionally contends that since AS 43.30.210[8] requires that Alaska's reciprocal intangible personal property exemption be construed to make uniform the laws of the state enacting it, Alaska should look to Washington law, which treats the vendor's interests in an executory contract to sell land as intangible personal property for purposes of death taxes.[9] As for Morris' power to mortgage the Fairview property, appellee points out it expired long before Morris' death so it cannot be used to characterize his interest at death.

The superior court followed the lead of the Washington authorities and held that Morris' interests were intangible personal property. The court then applied Alaska's reciprocal intangible personal property exemption and concluded that the interests were exempt from Alaska death taxes.

As was indicated previously, we are of the opinion that the superior court's decision should be affirmed. First, we turn to appellant's argument that Morris' property rights for death tax purposes in the Fairview property were enhanced by Morris' power to mortgage the property during

5. In re De Stuers' Estate, the nonresident decedent had contracted to convey his share of New York land held as cotenant, with the grantee to have possession immediately, and the decedent vendor to procure releases of his past wives' dower rights before closing. There the court held that characterization of the vendor's interest in executory contract for the sale of land "depends upon the substantiality of his interest." In determining the substantiality issue, the court looked to the vendor's legal title standing to bring ejectment if the vendee defaults, power to convey indefeasible title to a bonafide purchaser without notice standing to bring an action for waste and other factors to show that the vendor retains a substantial interest in the realty and not a mere chose in action, despite the doctrine of equitable conversion.

6. In re Paul's Estate, the two affirming justices distinguish the case of a mortgage, and ground their decision on the

vendor's retention of title and possession and the "modern tendency * * * to limit the levying of inheritance taxes to the sovereignty which is the situs of the actual property."

7. Panushka v. Panushka, 221 Or. 145, 349 P.2d 450 (1960); Land Dev., Inc. v. Padgett, 369 P.2d 888 (Alaska 1962); Williams v. DeLay, 395 P.2d 839 (Alaska 1964).

8. AS 43.30.210 reads:
   [AS 43.30.200] * * * shall be interpreted and construed to effectuate its general purpose to make uniform the law of those states and territories which enact it.

9. In re Eilermann's Estate, 179 Wash. 15, 35 P.2d 763 (1934); In re Plasterer's Estate, 49 Wash.2d 339, 301 P.2d 539 (1956). See also In re Ryan's Estate, 102 N.W.2d 9 (N.D.1960); In re Briebach's Estate, 132 Mont. 437, 318 P.2d 223 (1957).

1956 and give his mortgage priority over the vendee. Since Morris died after 1956, we find that argument lacks relevance. The Alaska tax at issue falls on transfers by will or intestacy and by the time Morris transferred his interest under the Fairview contract, the power to mortgage the property was no longer his to transfer.

■ In regard to the proper characterization of Morris' interests, as vendor, in the subject executory contracts of sale, we think that the substantial effect of the instruments employed, rather than the particular form used, should be of controlling significance. This approach is reflected in a series of decisions of this court, beginning with Land Development, Inc. v. Padgett, 369 P.2d 888 (Alaska 1962), dealing with contracts for the sale of land.[10] In the *Padgett* line of cases, we held that a land contract provision relating to forfeitures should not be enforced according to the strict letter of its terms. Rather, we held that land contracts should be treated somewhat in the manner of a mortgage in which the vendee is deemed to have an interest the forfeiture of which equity

abhors. This conclusion is consistent with Alaska's legislative policy regarding contracts for the sale of personal property which treats a conditional sales contract as leaving a mere security interest in the seller.[11]

■ Again, looking to substance rather than the form of the instruments in question in the case at bar, it is apparent that the contracts for sale were intended to be used as long term security agreements.[12] The use of land sale contracts as security devices is not uncommon in Western States, but is regarded with disapproval and rarely used in Eastern States. A note secured by a mortgage is generally treated as intangible personal property rather than an interest in real property for purposes of death taxes. Even in a title theory state, a mortgagee's interest is treated as intangible personal property rather than real property for death tax purposes.[13] Since a mortgagee is treated as holding intangible personal property, even in title theory states, we think a vendor under an executory land sale contract for security should be treated as holding intangible personalty.[14] In

---

10. *Padgett* holds that it is proper to deny the vendor enforcement of the forfeiture provision of a real estate contract like the Morris contracts strictly according to its terms, where the vendee has paid two-thirds of the purchase price. The court held it was proper to give the vendee one week to pay accrued interest and three months in which to pay the principal balance. *Padgett* is followed in Pollastrine v. Severance, 375 P.2d 528, 531 (Alaska 1962), and in Williams v. DeLay, 395 P.2d 839 (Alaska 1964). Jameson v. Wurtz, 396 P.2d 68 (Alaska 1964), follows *Padgett* in reversing a denial of specific performance to a vendee in default; the court held that the vendee should have been granted a grace period to cure her default. Alaska Placer Co. v. Lee, 455 P.2d 218 (Alaska 1969), distinguished *Padgett* and *Jameson* and required a forfeiture where less than one per cent of the purchase price had been paid.

11. AS 45.05.692(a) (1), as explained by Uniform Commercial Code § 9–102, comments 1, 2. *Compare* Rego v. Decker, 482 P.2d 834, 838 (Alaska 1971), where

we referred to the provisions of the Uniform Commercial Code regarding the requisite degree of certainty for specific performance of a contract not within the scope of the Uniform Commercial Code.

12. Here we distinguish between the land sale contract which is intended only to tie the parties down until closing. We likewise think that characterization distinctions should be drawn according to whether the vendor or vendee has possession, profits, and other benefits associated with ownership.

13. Kinney v. Stevens, 207 Mass. 368, 93 N.E. 586 (1911). Alaska is a lien theory state. Brand v. First Fed. Sav. & Loan Ass'n, 478 P.2d 829, 831 (Alaska 1970).

14. Professor Marsh summarizes the state of the authorities as follows:
The interest of a vendor under an executory contract to sell real property located in a state other than his domicile has been classified as both intangible, on the theory that an 'equitable conversion' has occurred and his right is merely a right to receive the purchase price, and as tangible, on

reaching this conclusion, we note our approval of the Washington and North Dakota decisions holding that the vendor's interest under an executory land sale contract is intangible personalty rather than realty.[15]

We are of the further view that death taxes should follow economic reality where feasible. The intangible personalty view means that the vendor's estate will include that which really benefited him, the right to receive the remainder of the purchase price and interest, while the vendee's estate will include that which really benefited him, the value of the property. The realty view means that the vendor's estate will include the value of the realty, while the vendee's estate may include nothing.[16]

In light of the foregoing, we affirm the trial court's decision that Morris' interests in the executory contracts were intangible personal property, and that under Alaska's reciprocal intangible personal property exemption his interests were exempt from Alaska death taxes.[17]

Affirmed.

the theory that taxation is an 'eminently practical matter' and the 'amiable fiction' of equitable conversion has no application. The same theory of equitable conversion has been both applied and denied application where there is a direction in the decedent's will to sell land which he owns in a foreign jurisdiction.

Mortgage notes secured by land in a foreign jurisdiction have generally been held to be intangible property, although doubtless the situs could tax the succession if its statute specifically covered the interest of the mortgagee.

Thus, it can be seen that the possibility of double inheritance taxation still exists with respect to many important types of property interests, even if we were to assume perfect correlation of the reciprocity provisions of all the states.

H. Marsh, Jr., Multiple Death Taxation in the United States, 8 U.C.L.A.L.Rev. 69, 78 (1961) (footnotes omitted).

15. In re Plasterer's Estate, 49 Wash.2d 339, 301 P.2d 539 (1956), involved a Washington domiciliary who died holding the vendor's interests in executory contracts to sell land in Alaska. The Washington court reasoned that the heirs inherited two interests: the fee interests subject to the vendees rights, which were realty Washington could not tax; choses in action against the vendees for the contract prices, which were intangible personal property subject to Washington's death taxes. In re Eilermann's Estate, 179 Wash. 15, 35 P.2d 763 (1934), is an earlier Washington decision involving a New Jersey domiciliary who died holding the vendors' interests in contracts for the sale of Washington land. The 4–1 decision held that the decedent's interest was intangible property, not realty, so not taxable in Washington. In re Ryan's Estate, 102 N.W. 2d 9 (N.D.1960), is a North Dakota case involving death taxes where a nonresident died holding the vendor's interest in a contract to sell North Dakota land. The case holds against taxation in North Dakota on the ground that the interest was tangible personalty, because the decedent's bare legal title was merely security without possession, profits, or other benefits of ownership, under the doctrine of equitable conversion, and because a tax based on the value of the real property could conceivably exceed the unpaid balance of the contract and so would not be rationally connected with the value of the decedent's interest.

16. The anomaly of this result is clear in the case of a $1,000,000 contract on which $999,999 has been paid. The value transferred to the decedent's heirs is the expectation of receiving $1, yet their share is diminished by death taxes which assume that the value transferred to them is the value of the land, probably closer to $1,000,000. The reflection of this unfair burden on the heirs is a windfall to the vendee's heirs if he dies when only a small fraction of the contract price remains due.

17. Regarding the possible solution of the problem of multiple state death taxation, Professor Marsh suggests that the danger could be eliminated if the existing statutes were supplemented and extended in two respects.

One is the adoption of the Uniform Reciprocal Transfer Tax Act or an exemption statute in those states which have adopted neither, and the simultaneous adoption in all states, both those following the reciprocity and the exemption approach of a uniform and meaningful statutory definition of an intangible. The other is the widespread adoption of the compulsory statute for the arbitration of domicile disputes.

H. Marsh, Jr., Multiple Death Taxation in the United States, 8 U.C.L.A.L.Rev. 68, 87 (1961).